## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| The Prudential Insurance Company of America, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 02-4060 |
| | ) |
| Laxmi P. Palaypu, | )<br>) |
| Defendant. | ) |

## __O R D E R__

Before the Court is Plaintiff, The Prudential Insurance Company of America's ("Prudential") Motion for Partial Summary Judgment. For the reasons set forth below, Prudential's Motion for Partial Summary Judgment [#22] is GRANTED with respect to Count I (breach of contract), the portion of Count IV alleging unjust enrichment for unearned commissions, and Count V (breach of the Uniform Commercial Code). Prudential's claims under Count II (conversion), Count III (fraud), and the portion of Count IV alleging unjust enrichment for certain "bonuses" paid by Prudential to Palaypu remain before the Court, as summary judgment was not sought with respect to these counts.

### __BACKGROUND__[1]

Prudential is a corporation incorporated under the laws of the state of New Jersey. Laxmi P. Palaypu ("Palaypu") resides in Moline, Illinois, and is a citizen of Illinois. Palaypu entered Prudential's Financial Services Associate Training Program in March, 2000, and signed a Financial

---

[1] The Court notes that Palaypu did not respond to Prudential's Statement of Material Facts as to Which There is No Genuine Issue. As the party opposing summary judgment, it is Palaypu's burden to specifically refute any properly supported factual assertions with competent evidence. Palaypu's failure to respond to these facts fails to meet his burden, and as a result, these factual assertions are effectively admitted.

Services Associate Training Agreement ("Training Agreement") when he began this program, which required him to pass all licensing exams during the training period. Palaypu worked out of Prudential's Moline, Illinois, office, and upon completing the training program and obtaining all requisite licenses, he entered into a Prudential Financial Services Associate Agreement with Prudential in June, 2000. Because he was unhappy with the compensation he was to receive under this Associate Agreement, Palaypu's supervisors, Andy Bebon and Mike Nelson agreed to move him into a different sales contract, and on August 14, 2000, Palaypu entered into a Statutory Agent Agreement ("Agreement") with Prudential.

The Agreement contained provisions regarding the parties' obligations, Palaypu's compensation, indebtedness and indemnification. By signing the Agreement, Palaypu acknowledged that he had read and understood its terms and, although he testified that he did not read the Agreement before he signed it, he admitted that he knew from his training and experience that signing the Agreement meant that he was bound by its terms. As a Statutory Agent, Palaypu's compensation consisted of commissions on sales of life insurance and other products, and "bonuses" to defray expenses he incurred during his duties as a sales representative. These commissions were paid out of the premiums a client paid for his insurance, and the agent does not earn the commission unless Prudential receives payment of the premiums from which the commission derives. Prudential recaptures earned commissions on certain policies that lapsed or were subject to cancellation for non-payment of premiums within their first year, even if Prudential had received some premium payments on those policies. If a policy lapsed within the first two years, Prudential was also permitted to recapture all commissions it paid an Agent based upon that policy.

When he became a Statutory Agent, Prudential invited Palaypu to participate in the Prudential Potential Commission Advance Plan ("PCAP"), which was established to alleviate the potential hardship to agents caused by the deferred nature of commission compensation by providing stable weekly income. Under the PCAP, an agent is able to receive weekly distributions from a Potential Commission Advance Account ("PCA Account") that is funded with advances based on the potential first-year commission on each policy sold. Prudential may advance agents up to eighty percent of unearned first-year commissions on the sale of life insurance products, but holds the remaining twenty percent in reserve to reduce the effect of lapses or cancellations of policies, which result in the reversal of commissions previously advanced to agents. Agents who participate in the PCAP are eligible to receive weekly withdrawals determined using a Basic Weekly Payment (BWP). The amount available for withdrawal is based upon several factors, including: (1) the balance in the PCA Account; (2) previous withdrawals from the PCA Account; and (3) the reserve held in the Account. Each week that an agent participates in the PCAP, his current PCAP-indebtedness is determined, and the difference between his earned commissions and his account withdrawals on the plan represents the current outstanding amounts of commissions advanced to the agent. This commission advance is the agent's debt to Prudential and must be repaid. These commissions advanced to an agent in a certain week may be repaid through commissions earned, called "returns," in following weeks. However, when withdrawals continue to exceed returns each week, the agent's commission advance debt will gradually increase.

In addition to commission advances under the PCAP, Prudential provides agents with "express commissions" on pre-paid life insurance business, which allows an agent to receive a portion of his commission before the policy has gone through the underwriting process and has been

issued. Prudential generally deposits the express commissions into the PCA Account when a policy is called in to underwriting, and, subject to the rules of the PCAP, these commissions are available for withdrawal. If a policy is not issued and express commissions have been paid on that policy, Prudential recaptures the commissions from the agent's account, and if the policy is then ultimately issued, Prudential recomputes the commissions and credits them to the agent's account.

During his time with Prudential, Palaypu participated in the PCAP compensation plan and understood that his commissions were subject to recapture if his clients' policies lapsed during their first year. Although Palaypu claimed not to have seen documents explaining how the PCAP worked, he admits that Prudential gave him a "product compensation highlighter" for Variable Universal Life ("VUL") policies which explained, among other things, how commissions would be recaptured for early lapse or termination. Furthermore, Palaypu received weekly statements detailing the commissions he had received, as well as all deposits and withdrawals to his PCA Account.

In 2000, 2001, and 2002, while associated with Prudential, Palaypu submitted applications for numerous VUL insurance policies, most of which were for face amounts exceeding $1,000,000. Although some of these applications were rejected, many of them were issued, but many of the issued policies lapsed within their first year, after Prudential received only a few monthly premium payments. Nonetheless, under the PCAP, Palaypu received commission advances or express commissions on all of these policies. Because the policies were never issued or lapsed shortly after issue, the amount of commissions Palaypu actually earned on his insurance sales for Prudential was far less than the amount of compensation Prudential advanced to him. When Palaypu was covered under the PCAP, he withdrew $524,280.98 from his PCA Account, and as of April 30, 2004, he has actually earned no more than $100,409.46 in commissions on the policies he sold. Upon

consideration of the recapture of potential commissions and the lapse of additional policies since Palaypu's association with Prudential ended on March 1, 2002, his PCAP debt presently stands at $423,871.52.

Palaypu also owned Prudential insurance policies on himself and members of his immediate family. He wrote several checks to pay premiums on these policies, totaling an amount of $13,482.74, that were dishonored by his bank due to insufficient funds  Additionally, Palaypu wrote numerous checks for premiums due on his clients' policies when they were in danger of lapsing. Although he was aware that company policy prohibited this practice, Palaypu made payments, from his own checking account, on behalf of clients with the understanding that those clients would pay him at a later time. When these clients failed to reimburse him, Palaypu removed the allotted funds from his personal account, causing the checks to bounce. All told, Palaypu wrote checks on policies other than his own totaling approximately $43,000, and his bank dishonored 28 of these checks, totaling approximately $37,000.

Prudential initiated a formal investigation of Palaypu's business practices in early 2002, which resulted in Palaypu's suspension, effective February 7, 2002. Palaypu's Agreement was terminated by Prudential on March 7, 2002. On July 12, 2002, Prudential filed a five-count Complaint, alleging: (I) breach of contract, (II) conversion, (III) fraud, (IV) unjust enrichment, and (V) breach of the Uniform Commercial Code ("UCC"). Prudential has now moved for partial summary judgment as to Count I, a portion of Count IV, and Count V, but does not seek summary judgment based on its claims of fraud, conversion, or unjust enrichment for certain "bonuses" the company paid Palaypu at this time. The matter has become fully briefed, and this Order follows.

## STANDARD OF REVIEW

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

## Discussion

**I.     Appeal to Strike**

Palaypu filed an Appeal to Strike the Motion filed by Prudential for Partial Summary Judgment ("Appeal to Strike"), but cites no valid basis upon which this Court should strike the Motion. This Appeal to Strike alleges that Prudential's Motion "does not hold any truth or valid reason to justify its claim for Summary Judgment (whether in full or in part) or award of any damages." Essentially, Palaypu claims that the Motion should be denied. However, he does not assert that Prudential filed a procedurally deficient motion or did not comply with Local Rules. Consequently, Palaypu's Appeal to Strike is denied.

**II.    Breach of Contract**

Prudential alleges that Palaypu breached his contract, the Agreement, when he failed to repay his debt to Prudential. To state a cause of action for breach of contract under Illinois law, a plaintiff's must show four elements: (1) the existence of a valid and enforceable contract; (2) the plaintiff's performance of all its contractual obligations; (3) the breach of the contract by the defendant; and (4) resulting damages to the plaintiff. Priebe v. Autobarn, Ltd., 240 F.3d 584, 587 (7th Cir. 2001).

As to the first element, it is undisputed that a valid contract existed between Prudential and Palaypu, because Palaypu does not contest the legitimacy of his Agreement with Prudential. The facts in this case demonstrate that the required elements for contract formation were present; there was an offer, acceptance, and consideration. Prudential offered the Agreement to Palaypu on August 14, 2000, which Palaypu then signed and returned to Prudential, signifying his acceptance of the Agreement's terms. Consideration existed for the Agreement, because Prudential agreed to provide

Palaypu compensation for his services, and it complied with the terms of the Agreement by compensating Palaypu pursuant to the PCAP.

The second element is fulfilled because Prudential has shown that it performed its obligations under the Agreement. After Palaypu became a Statutory Agent of the company, pursuant to the Agreement, Prudential had an obligation to compensate him "in accordance with the terms and conditions of its then applicable Compensation Plans and its Commission and Compensation Schedules . . . [.]" (Agreement, § 5). Prudential has demonstrated that it fulfilled this responsibility by allowing Palaypu to participate in its PCAP compensation program and receive advances on his commissions, and also presents evidence that it forwarded Palaypu over $500,000 in commissions pursuant to that program. In response, Palaypu has presented no specific, admissible facts tending to show that Prudential did not perform its duties under the Agreement.

The third element of a claim for breach of contract is met because Palaypu breached the contract when he failed to repay his debt to Prudential. Section 9 of the Agreement states:

> To the extent permitted by applicable law, you authorize the Company to offset as a first lien any of your indebtedness to the Company against any amounts accruing to you . . . from the Company, until the amount of such indebtedness is fully paid, with applicable interest. This authorization includes, but is not limited to, authorization for the Company to deduct indebtedness from any final payment due to you upon the Agreement's termination.
>
> Debt not fully satisfied by such offset is your personal debt and is recoverable at any time with the maximum allowable interest under the Company's policies and applicable law. The Company reserves the rights to demand full and immediate repayment of such indebtedness. The terms of this section are without limitation on any rights of the Company, whether set forth in this Agreement or not, both prior to and after the termination of this Agreement, to recover any indebtedness.

The Agreement explicitly refers to Prudential's ability to collect any debts, which includes amounts that were advanced to Palaypu and subject to recapture. Prudential has demonstrated that Palaypu withdrew $524,280.98 from his PCA Account but earned only $100,409.46 in commissions, and

-8-

Palaypu has not refuted this showing with any evidence indicating that Prudential's calculations are incorrect. Thus, by failing to repay the commissions that he was advanced, Palaypu breached his Agreement with Prudential.

Finally, element four is fulfilled because Prudential was clearly harmed by Palaypu's breach. At the time of Palaypu's termination, he was advanced over $400,000 on commissions that he had not yet earned. Palaypu's debt grew as the policies he sold continued to lapse, and because he failed to reimburse Prudential for this debt, Prudential was directly harmed by their monetary loss. Therefore, Prudential has met its burden of showing an absence of disputed material facts as to the four elements required to state a claim for breach of contract against Palaypu.

In his Response Protesting Plaintiff's Motion for Partial Summary Judgment ("Response"), Palaypu makes several bare, conclusory assertions that he is not liable for any debt to Prudential, unsupported by any evidence showing the existence of an issue that warrants a trial. Palaypu asserts that he is not liable for breaching the Agreement because Prudential never "advanced" him any commissions since the payments in question were treated as "earned income" for purposes of employee benefits and W-2 tax forms. Because the payments were categorized as "earned income," Palaypu claims that the "commission advances" are not "commissions subject to recapture." This distinction elevates form over substance, and is meaningless. Palaypu's argument ignores both the economic realities of the situation and the terms of his compensation arrangement with Prudential, which enabled Prudential to recapture commissions on policies that lapsed within the specified period, regardless of whether they were deemed "commission advances" or "commissions subject to recapture." Under the terms of the Agreement, Palaypu was contractually obligated to repay

Prudential for all recaptured commissions, whether the payments were designated as advances, subject to recapture, earned or unearned.

Palaypu also claims that his obligation to repay the recaptured commission expired when his affiliation with Prudential terminated. This argument is also refuted by the terms of Palaypu's Agreement with Prudential, which states that Prudential had "maximum authority to recover indebtedness," and that right "survive[d] the termination" of the Agreement and the termination of Palaypu's status as an agent with Prudential. The plain terms of his Agreement explicitly affirm that Palaypu's obligations to Prudential survived his termination.

Finally, Palaypu argues that Prudential was responsible for his actions because it failed to warn him about or prevent his improper practices. However, this claim of contributory negligence by Prudential is not available to Palaypu, because an argument of comparative or contributory negligence is not a defense in contract actions. Outboard Marine Corp. v. Babcock Industries, Inc., 106 F.3d 182, 184 (7th Cir. 1997). Accordingly, Palaypu is exclusively liable for the damages resulting from his breach of the Agreement, regardless of whether Prudential failed to monitor his performance or alert him when he violated rules. Likewise, even if Prudential's incorrect underwriting decisions resulted in the approval of policies that lapsed within two years, as Palaypu alleges, he cannot blame Prudential for the losses that ensued thereafter. Palaypu received advance commissions on the sales of these policies, and he knew that Prudential would have to be reimbursed for these commissions if the policies lapsed. When the policies lapsed, it was Palaypu's sole responsibility to return the commissions advanced to him by Prudential.

Consequently, because Palaypu has not shown that there is any genuine issue as to any material fact, summary judgment for Prudential on its breach of contract claim is appropriate. Due

to his valid contractual obligation to repay his debt, Palaypu is liable to Prudential for the unearned commissions he retained, which amounts to $423,817.52, plus interest.

### III.    Unjust Enrichment

Prudential alleges, in the alternative, that if a valid contract did not exist between Palaypu and Prudential, Palaypu still would be liable for the unearned commissions he withheld under a theory of unjust enrichment. Because it has been determined that Prudential is entitled to summary judgment on its claim for breach of contract, this Court need not separately address Prudential's unjust enrichment theory for the unearned commissions retained by Palaypu.

### IV.    Breach of the UCC

Palaypu is liable for checks he wrote to Prudential that were subsequently dishonored if Prudential can establish that he violated Section 3-414 of the Illinois Uniform Commercial Code ("UCC"). Section 3-414 states: "If an unaccepted draft is dishonored, the drawer is obliged to pay the draft (i) according to its terms at the time it was issued, or if not issued, at the first time it came into the possession of a holder . . . The obligation is owed to a person entitled to enforce the draft or to an indorser who paid the draft." 810 ILCS 5/3-414(b).

To pay for policies owned by him and his immediate family members, Palaypu wrote five checks totaling $13,842.74, which were then dishonored because he removed funds from his account. Palaypu claims that he "had the freedom to pay or not to pay, honor or dishonor a premium check payment at his desire to continue or discontinue having a policy." Although this statement is true, and Palaypu had the power to discontinue payments on his personal policies at any time he wished, Palaypu misjudges the intent of Prudential's claim. Prudential does not seek to force Palaypu to continue paying premiums on his personal insurance policies, but rather to enforce

Palaypu's promise to pay contained in the checks written to Prudential regarding these policies. Although Palaypu was able to stop paying premiums and cancel his insurance policies with Prudential at will, he cannot issue checks to Prudential that lack appropriate funds.

Under the Illinois UCC section 3-414, Palaypu, as the drawer of the check, is required to pay the draft "according to its terms at the time it was issued," and reimburse Prudential, as the "person entitled to enforce the draft," for the value of each dishonored check. Other than maintaining that he was not required to keep the policies, Palaypu presents no evidence to dispute these allegations. Therefore, summary judgment on this claim is proper, and Palaypu is required to pay Prudential $13,842.74, the full amount of each dishonored check written on his personal insurance policies.

## Conclusion

For the foregoing reasons, Prudential's Motion for Partial Summary Judgment [#22] is GRANTED as to Count I for breach of contract, the portion of Count IV for unjust enrichment of unearned commissions, and Count V for breach of the UCC. Prudential's claims under Count II for conversion, Count III for fraud, and the portion of Count IV for unjust enrichment for certain "bonuses" Prudential paid to Palaypu, will remain before the Court for trial.

Entered this 25th day of August, 2004.

s/Michael M. Mihm
Michael M. Mihm
United States District Judge